De'L. A. v City of New York (2017 NY Slip Op 08897)





De'L. A. v City of New York


2017 NY Slip Op 08897


Decided on December 21, 2017


Appellate Division, First Department


Gesmer, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 21, 2017
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

John W. Sweeny, Jr., J.P.
Richard T. Andrias
Karla Moskowitz
Marcy L. Kahn
Ellen Gesmer JJ.


8056/04 3673 

[*1]Joseph L. De'L. A., etc., et al., Plaintiffs-Respondents-Appellants,
v
The City of New York, et al., Defendants-Respondents, Jewish Child Care Association of New York, Defendant-Appellant, Joseph S., Defendant.



Cross appeals from the order of the Supreme Court, Bronx County (Julia I. Rodriguez, J.), entered on or about October 20, 2015, which, to the extent appealed from as limited by the briefs, granted defendant the City of New York's and defendant Milcia Pineda's respective motions for summary judgment dismissing the complaint as against them, and denied defendant JCCA's motion for summary judgment with respect to the negligence claims against it.




Wilson Elser Moskowitz Edelman & Dicker LLP, New York (Judy C. Selmeci of counsel), for appellant.
Sullivan Papain Block McGarth & Cannavo, P.C., New York (Brian J. Shoot, Gregory J. Cannata, and Gregory J. Cannata & Associates of counsel), for Joseph, L. De'L. A. and Deborah A., respondents-appellants.
Roberta L. DiGangi, Brooklyn, for Yolanda Jenkins, respondent-appellant.
Schnader Harrison Segal & Lewis LLP, New York (Bruce M. Strikowsky of counsel), for the City of New York, respondent.
Koster Brady & Nagler LLP, New York (Allyson P. Stavis of counsel), for Milcia Pineda, respondent.



GESMER, J.


In this case, defendant Jewish Child Care Association (the agency or JCCA), placed the infant plaintiff, Joseph. L. De'L. A., in a foster home with defendant Milcia Pineda. The child suffered brain injury when he was left in the care of the teenage boyfriend of the foster mother's daughter. The child's biological and adoptive mothers brought this action on his behalf. The City of New York, the foster parent, and JCCA each moved for summary judgment. Supreme Court granted the motions by the City and Ms. Pineda, but denied JCCA's motion. We now affirm.
Our dissenting colleagues join us in finding that the motion court properly granted the summary judgment motions of the foster parent and the City, for the reasons discussed below. However, where an institutional defendant fails to comply with rules intended to protect the safety of those for whom the institution is responsible, and such an individual is assaulted, it is a question of fact as to whether the institutional defendant is liable (Mirand v City of New York, 84 NY2d 44, 51 [1994]; Garcia v City of New York, 222 AD2d 192, 197 [1st Dept 1996], lv denied 89 NY2d 808 [1997]; Dawn VV. v State of New York, 47 AD3d 1048, 1051 [3d Dept 2008]). That question cannot be resolved on the agency's summary judgment motion because "[p]roximate cause is a question of fact for the jury where varying inferences are possible" (Mirand, 84 NY2d at 51). Because we do not view plaintiffs' claims against JCCA as one of "the rare cases in which it can be determined, as a matter of law, that a defendant's negligence merely created the opportunity for, but did not cause, the event that resulted in harm" (Hain v Jamison, 28 NY3d 524, 530 [2016]), we also affirm the motion court's denial of summary judgment to JCCA.
Facts
At least as of July 22, 2002, JCCA had determined that it was not appropriate to place a foster child under five in defendant Milcia Pineda's home. On August 20, 2002, JCCA reauthorized the use of Ms. Pineda's home for foster care, with the recommendation that she "should have school-aged children placed in her home." It reached this conclusion because Ms. Pineda was already caring for her newborn special needs grandson and her teenage daughter; her home was in "crisis" and needed to be "stabilized"; and she was working full time in a hair salon [FN1]. In fact, it was the opinion of the assigned worker that no foster child should have been assigned to Ms. Pineda's home until it was "stabilized."
An agency report on the infant plaintiff in August 2002 stated that he "cries excessively" and is "very hard to cons[ole]," so that "caregivers have difficulty providing comfort to [him]." The agency was required to provide information such as this about the child's behavior problems to the foster parent (18 NYCRR 443.2[e][3][iii])
On September 5, 2002, the agency placed the then 29-week-old infant plaintiff in Ms. Pineda's home. There is no evidence in the record that Ms. Pineda's home had been "stabilized" by that date, or that JCCA advised Ms. Pineda of the baby's behavioral issue.
The regulations of the New York State Department of Social Services require that foster parents who seek to be employed must obtain prior agency approval of their "plans for the care [*2]and supervision of the child at all times" (18 NYCRR 443.2[c][1][iii]). It is the agency's responsibility to train foster parents as to their responsibilities (18 NYCRR 443.2[d][1][vii] and [e]), and to sign an agreement providing that they may not "leave children under the age of 10 years alone without competent adult supervision" (18 NYCRR 443.3[b][3]). In support of this motion, JCCA submitted the testimony of their employees that these requirements were repeated in a manual for foster parents. However, since that manual is not in the record, JCCA has failed to establish that.
In any event, there is no evidence in the record establishing that a JCCA employee ever advised Ms. Pineda of these provisions, or gave her a copy of the manual or that she ever saw one. In addition, she testified that no one had ever advised her that she could not leave the child with a caretaker under 18 years of age. Moreover, the contract that JCCA asked Ms. Pineda to sign did not comply with State law, but rather provided that she would not leave a child under 10 years old alone "without competent supervision."
There is also no evidence that the agency, knowing at the very least that Ms. Pineda was likely to be working during the day, inquired as to her child care plans or made any effort to ensure that an appropriate child care plan was in place, as required by State regulation and its own policies when a foster parent works outside the home.
In November 2002, the infant plaintiff's birth mother observed a bruise on the baby and reported it to an agency worker and supervisor. Hospital records from February 26, 2003 revealed that the child had "multiple bruises differing in size and stage of healing" on his chest, back, buttock, and legs.
The agency's practice guide requires a minimum of two face-to-face contacts a month, one of which was to be in the home. Nevertheless, JCCA did not visit Ms. Pineda's home even once from November 27, 2002 to February 21, 2003, a three-month period.
The JCCA worker's notes from the February 21 visit indicate that "Joseph's babysitter, Abila" was present, but this person had not been approved by JCCA. JCCA's Program Director testified that the proper procedure in this circumstance would have been for the caseworker to tell the foster parent "she cannot work and cannot use the baby-sitter without being present." There is no evidence in the record that JCCA took any steps at or immediately after the visit to ensure that only agency-approved persons cared for the child.[FN2]
On February 25, 2003, Ms. Pineda's daughter left for school, and Ms. Pineda went to work, leaving her grandchild and the infant plaintiff, who had been running a fever, in the care of then-17-year-old defendant Joseph S., the father of Ms. Pineda's grandchild [FN3]. When the infant [*3]plaintiff would not stop crying, S. apparently shook him, causing him to suffer brain damage [FN4]. The hospital records reveal that the infant plaintiff arrived at the emergency room with "multiple bruises, differing in size and stage of healing," suggesting that JCCA had failed to observe signs of mistreatment of the child predating the events of February 25, 2003. The City's investigation following the incident found that Ms. Pineda displayed "poor judgment" in leaving the infant plaintiff with S., who pleaded guilty to reckless endangerment of the child.
Analysis
The motion court correctly dismissed the complaint as against the City, since there is no evidence in the record that the City had notice that the child would be entrusted to an unqualified babysitter (see Lillian C. v Administration for Children's Servs., 48 AD3d 316, 317 [1st Dept 2008]). Accordingly, the City is not liable for the injuries sustained by the child. The motion court also properly dismissed the complaint against the foster mother because a child does not have a legally cognizable claim for damages in this case (McCabe v Dutchess County, 72 AD3d 145, 148 [2d Dept 2010]; see also Holodook v Spencer, 36 NY2d 35 [1974]). For the reasons discussed below, we also find that the motion court properly denied the agency's summary judgment motion.
The record suggests that JCCA may have been negligent in at least five respects. First, the agency placed the child in Ms. Pineda's home when he was a newborn, even though it had previously determined that children under five should not be placed with her because she was working or looking for work, and that her home required "stabilizing," because her 16 year-old-daughter had recently given birth to a baby with special needs. Second, JCCA failed to ensure that an appropriate child care plan was in place after it had determined that Ms. Pineda was employed outside the home, as the applicable regulation requires (18 NYCRR 443.2[c][1][iii] [requiring that a "suitable plan[]" for child care by agency approved caretakers be made part of the foster family record where the foster parent works outside the home]). Moreover, there is no evidence that JCCA had ever advised Ms. Pineda that she needed to seek approval of her child care plan. Third, JCCA had notice, prior to the date on which the child was injured, that at least one unauthorized person was caring for him, but failed to take any action to rectify this, violating its own rules and the relevant regulation (id.). Fourth, JCCA's contract with Ms. Pineda stated merely that she was not to leave the infant plaintiff without competent supervision. This violates the applicable regulation, entitled "Certification or approval of foster family homes," which requires agencies to have foster parents acknowledge in writing that they will not "leave children under the age of 10 years alone without competent adult supervision" (18 NYCRR 443.3[b][3][emphasis added]). Moreover, Ms. Pineda testified that she was never advised that she was not permitted to leave a foster child in the care of someone under 18. Finally, at the time of the February 21, 2003 home visit, JCCA had failed to visit the home for a three-month period, in violation of its own requirement of at least two contacts per month, with at least one to take place in the home. Under these circumstances, a jury could find that, had the agency followed the applicable regulations and its own rules, the special needs infant plaintiff might never have [*4]been left alone with a teenager already caring for his own special needs infant,[FN5] and who was prohibited from caring for the infant foster child.
Where the acts of a third person intervene between a defendant's negligent conduct and a plaintiff's injury, the causal connection between the two is not severed as a matter of law. Rather, liability turns on whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence. An intervening act may break the causal nexus when it is "extraordinary under the circumstances, not foreseeable in the normal course of events, or independent or far removed from the defendant's conduct" (see Maheshwari v City of New York, 2 NY3d 288, 295 [2004] [internal quotation marks omitted]). However,
"[a]n intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders the actor negligent. . . . That defendant could not anticipate the precise manner of the accident or the exact extent of injuries. . . does not preclude liability as a matter of law where the general risk and character of injuries are foreseeable" (Derdiarian v Felix Contr. Corp., 51 NY2d 308, 316—317 [1980]). Accordingly, in cases where an assault occurs under circumstances where an institutional defendant violated its own procedures designed to protect those it is responsible for, the harm may be foreseeable and the defendant is not automatically relieved of liability (Mirand v City of New York (84 NY2d at 50-51] [school liable for assault on student where, inter alia, it failed to have security personnel present in violation of its own security plan]; Garcia v City of New York (222 AD2d at 194 [school liable where student sexually assaulted by older child after being permitted to go to the bathroom alone, in violation of school memoranda requiring children to go to the bathroom in pairs]; Dawn VV. v State of New York, 47 AD3d at 1051 ["it was foreseeable that a resident could engage in some type of physical assault against another resident if the enacted safety plans were not adhered to"]).
Here, the agency violated its own policies and applicable regulations requiring a child care plan for foster children whose foster parents work outside the home, permitting only agency approved caretakers, and prohibiting anyone under 18 from providing child care. Those policies are designed to protect a foster child from being injured as a result of being left alone with a person who is not qualified to care for him. A jury could find that it is foreseeable that the agency's failure to follow those policies and regulations might result in the very harm suffered by the infant plaintiff.[FN6]
In Hain v Jamison (28 NY3d 524 [2016], supra), the Court discussed the elements common to those rare cases in which courts have found, as a matter of law, that an intervening act broke the chain of causation. The Court noted that in such cases one of the following elements is present: (1) "the risk created by the original negligence was not the risk that materialized into harm; in other words the intervening act was unforeseeable," or (2) "defendant's acts of negligence had ceased, and merely fortuitously placed the plaintiff in a location or position in which a secondary and separate instance of negligence acted independently upon the plaintiff to produce harm" (Hain, 28 NY3d at 531-532).
Neither element is present in this case. The risk created by JCCA's failure to follow its own policies and applicable regulations was that the child would be left with someone not competent to care for him, and he would be injured as a result. That is precisely what occurred.
Nor had JCCA's negligence ceased at the time of injury. The agency's duty to the infant plaintiff, and its apparent negligence, began on September 5, 2002, when it placed the child in a home that it had previously determined was not appropriate for an infant; it continued through February 3, 2003, when the agency noted in its file that Ms. Pineda was working, but failed to ensure that she had an appropriate child care arrangement in place; it continued through February 21, 2003, when its caseworker recognized that Ms. Pineda was using an unapproved babysitter for the child, but apparently did nothing to ensure that Ms. Pineda knew that this was not permitted; and it continued through the moment when the foreseeable consequence of the agency's ongoing negligence, injury by an unsuitable caregiver, occurred on February 25, 2003.
The dissent views the absence of Ms. Avila on the day the infant plaintiff was injured as "unforeseeable" and an "extraordinary circumstance[]." This misses the point that the agency had notice that Ms. Pineda was working, but it had never approved, or even requested, a child care plan. Therefore, it already had notice that the child was being left with at least one unapproved caretaker, making what occurred more, not less, foreseeable.
It was also foreseeable, given what the agency knew of Ms. Pineda, her home, and her work, that she might not be able to manage a second special needs infant; that she might turn to a free resource for child care; that she might turn to S., who was at her home every day; and that S., a teenager, would not be capable of handling, alone, both his own special needs infant son, and the infant foster child, whom the agency knew often cried inconsolably.[FN7]
We dispute the dissent's claim that the agency had no reason to know that S. or anyone else in frequent contact with the infant plaintiff might hurt him. In fact, the old bruises found by the hospital indicate that someone may have hurt him prior to the events of February 25, 2003, and the agency missed it, despite the mother's complaints to a caseworker and supervisor about bruises.
We also find unpersuasive the dissent's conclusion that "JCCA could not have reasonably foreseen that S. would attack Joseph." The factor of foreseeability is not focused on "the precise manner of the accident or the exact extent of injuries," but on whether "the intervening act occurring is the very same risk which renders the actor negligent" (Derdiarian, 51 NY2d at 316—317). There is at least a question of fact, based on the record before us, as to whether JCCA took any steps to ensure that an appropriate child care plan was in place, although Ms. Pineda had advised the JCCA worker that she was working outside the home. Moreover, the record does not show that JCCA advised Ms. Pineda that all caregivers had to be approved by the agency and that she could not leave the child alone with anyone under 18. Since all of these policies and regulations are intended to prevent foster children from being injured by persons unqualified to care for them, the harm in this case may have been a foreseeable consequence of JCCA's alleged negligence.[FN8]
The dissent's conclusion that S.'s acts were "independent of and far removed from JCCA's original acts of negligence" ignores the "uniquely fact-specific" nature of proximate cause determinations, and the Court of Appeals' admonition that
"where the risk of harm created by a defendant's conduct corresponds to that which actually results-—absent an extraordinary intervening act or significant facts weighing in favor of attenuation-—it cannot be said, as a matter of law, that a defendant's negligence merely furnished the occasion for the harm . . . . Under such circumstances, the determination of proximate cause is best left for the factfinder"
(Hain, 28 NY3d at 530). Here, as the dissent concedes, the agency's failure to monitor Ms. Pineda's employment search "resulted in her being absent . . . at the time of S.'s attack, and entrusting Joseph to the care and supervision of the underage S." It should be left to the [*5]factfinder to determine whether or not this negligence was a proximate cause of the infant plaintiff's injuries.
Our dissenting colleagues would hold, as a matter of law, that JCCA cannot be held liable for the baby's injuries because S.'s conduct was an independent intervening act having no relationship to the risk created by JCCA's negligence. This would be inconsistent with the governing decisions of the Court of Appeals. The Court of Appeals has declined to find, as a matter of law, that a defendant was relieved of liability by intervening acts in situations where the harm suffered was much less obviously tied to the risk created by defendant than in this case. For example, in Derdiarian, relied on by the dissent, the plaintiff was repairing a pipe with molten enamel when a passing driver had an epileptic seizure and crashed his car through a gate on the construction site, hitting the plaintiff, knocking him into the air, and causing him to be covered with the molten enamel and to burst into flames. The Court affirmed the judgment against the defendant construction company, holding that the factfinder could have found that the defendant negligently failed to protect the site, and that a prime hazard of such negligence was the possibility that a car might enter and injure a worker (Derdiarian, 51 NY2d at 316).
In Hain (28 NY3d at 524), also cited by the dissent, a woman was struck by a car and killed after she stopped her car on a road at night and got out to assist a newborn calf that had broken out of its enclosure on a nearby farm. When the defendant farmer moved for summary judgment, the Court denied it, holding that it was for the jury to decide if his negligence in letting the calf escape was the proximate cause of the plaintiff's injury (id. at 534). In reaching that result, the Court, in its more recent pronouncement on this subject, stated, "A review of our case law highlights the distinction between instances where proximate cause is a question for the jury and the rare cases in which it can be determined, as a matter of law, that a defendant's negligence merely created the opportunity for, but did not cause, the event that resulted in harm" (id. at 530). If Hain was not such a case, then certainly this case is not.[FN9]
In sum, JCCA placed the infant plaintiff in harm's way by disregarding its own guidelines and New York regulations, all meant to protect the child and keep him free from precisely the kind of danger that ultimately occurred. Accordingly, JCCA has failed to meet its burden to show, as a matter of law, the absence of a material question of fact that its negligence was a proximate cause of the infant plaintiff's injury.
Accordingly, the order of the Supreme Court, Bronx County (Julia I. Rodriguez, J.), entered on or about October 20, 2015, which, to the extent appealed from as limited by the briefs, granted defendant the City of New York and defendant Milcia Pineda's respective motions for summary judgment dismissing the
complaint as against them, and denied defendant JCCA's motion for summary judgment with respect to the negligence claims against it, should be affirmed, without costs.
All concur except Sweeny, J.P. and Kahn, J. who dissent in part in an Opinion by Kahn, J.




KAHN, J. (dissenting in part)


I am in agreement with the majority that the complaint was properly dismissed as to the City and the foster mother. Because the agency's negligence was not a proximate cause of the injury to the infant plaintiff, however, I respectfully dissent in part and would grant the agency's motion for summary judgment dismissal of the complaint.
This case involves an infant placed in foster care who was shaken and beaten by the 17-[*6]year-old boyfriend of the foster mother's daughter while the foster mother was not at home, resulting in injury to the infant. Negligence claims were brought by the natural and subsequent adoptive mothers of the child against JCCA, the agency that placed the infant in the foster home; Milcia Pineda, the foster mother; and the City of New York. All three defendants moved for summary judgment of dismissal. Supreme Court denied JCCA's summary judgment motion as to the negligence claims against the agency, finding issues of fact as to the agency's negligence in several respects and as to whether the boyfriend's attack of the infant was a superseding act severing the causal connection between JCCA's alleged negligence and the injury to the child, but granted the summary judgment motions of Pineda and the City.
I. Statement of Facts
On July 22, 2002, JCCA completed an evaluation of Pineda's home, in which the agency had successfully placed foster children twice before, as a potential foster home. In that report, JCCA stated its conclusion that the home would best serve a foster child above the age of five. Nonetheless, on September 5, 2002, with JCCA's facilitation, the infant plaintiff Joseph L.De'L.A. (Joseph), born February 12, 2002 and then nearly seven months old, was placed as a foster child in Pineda's home. Pineda, a certified foster parent, had already fostered two children through JCCA. Although those children no longer lived in Pineda's home when Joseph arrived there, as stated in the JCCA report, another infant did. That child, Angel S. (Angel), born August 5, 2002, was the newborn son of Pineda's daughter, Pilar E., who was then 16 years old and also lived in the Pineda home. The agency noted in its Annual Reauthorization Narrative for the period from September 15, 2002 to September 16, 2003 that the Pineda home was "in need of stabilizing" since Pilar has recently given birth to a son and that Pineda "should have school-aged children [rather than another infant] placed in her home due to the fact that she is employed full-time."
Joseph S., Pilar's boyfriend, the 17-year-old father of Angel, was a frequent visitor to the Pineda home but did not live there. JCCA was aware of S. because JCCA caseworkers had met him during home visits.
S. was not the only nonresident of the Pineda home who was frequently present there, however. Beginning in November 2002, because Pineda was routinely at work and Pilar was at school during the day, Venica Avila, then 53 years old, began babysitting for Joseph and Pilar's son. JCCA was aware of Avila's role because she had accompanied Pineda on visits to JCCA offices, together with Joseph and Angel.
On Friday, February 21, 2003, a JCCA caseworker came to the Pineda home to conduct a home visit and found nothing out of ordinary. She noted that Joseph was "a pleasant baby that's easy to care for," and that he had greeted her with a smile.
On Sunday, February 23, 2003, Avila was notified that her mother, who lived in the Dominican Republic, was ill. Avila left country that same day to attend to her family emergency.
On Monday, February 24, 2003, Pineda left home for work and Pilar left to attend school, leaving S. at home with Joseph, who by that time was one year old, and his own son, Angel, who by that time was nearly seven months old and had been diagnosed as a special needs child.
On Tuesday, February 25, 2003, Pineda took Joseph to the hospital because he was vomiting. A doctor informed Pineda that Joseph had been shaken and beaten, had bruises on his back and head and that his body was covered with multiple old and new bruises. S. later confessed that during the time that he was alone in the house with Joseph and his own son, he had shaken Joseph because he was crying. As a result of having inflicted these injuries on Joseph, resulting in permanent brain damage to the child, S. was indicted and convicted of reckless endangerment in the first degree and was sentenced to one to three years in prison.
II. Discussion
Summary judgment is appropriate where "upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party" (CPLR 3212[b]). In negligence cases, a defendant is entitled to summary judgment where the defendant "establishe[s], as a matter of law, that the alleged negligence was not a proximate cause of plaintiff's injuries" (Gerrity v Muthana, 7 NY3d 834, 836 [2006]).
The facts as to JCCA's conduct in this case are undisputed. JCCA negligently failed to meet its own standards and those set forth in the New York Social Services Law by placing the infant plaintiff in a home unsuitable for an infant below the age of five, as Pineda was working or looking for work; where Angel, another infant with special needs, was already residing and shortly after JCCA noted that the home needed "stabilizing"; by failing to ensure that an appropriate child care plan was in place; by failing to approve a babysitter upon determining that Pineda was employed outside the home; by failing to arrange for a caseworker to conduct home visits for a period of three months following placement (although, three days prior to S.'s attack of Joseph, a JCCA caseworker did visit the Pineda home but reported finding nothing out of the ordinary); and by failing to follow its own rules by not monitoring Pineda's search for employment, which resulted in her being absent from the house at the time of S.'s attack, and entrusting Joseph to the care and supervision of the underage S.. Notwithstanding the indisputably negligent actions of JCCA, however, "[e]vidence of negligence is not enough by itself to establish liability, for it also must be proved that the negligence was a proximate, or legal, cause of the event that produced the harm sustained by the plaintiff" (Hain v Jamison, 28 NY3d 524, 528 [2016] [internal quotation marks omitted]).
Although the issue of whether a defendant's negligence was the proximate cause of a plaintiff's injury is normally the province of the finder of fact, as the Court of Appeals has explained:
"There are certain instances, to be sure, where only one conclusion may be drawn from the established facts and where the question of legal cause may be decided as a matter of law. Those cases generally involve independent intervening acts which operate upon but do not flow from the original negligence" (Derdiarian v Felix Contr. Corp., 51 NY2d 308, 315 [1980]).
Such is the case before us. Here, S., a person with whom JCCA had no direct relationship and over whom the agency had no authority or control, attacked Joseph while visiting a home in which Joseph had been negligently placed as a foster child by JCCA. Thus, S.'s attack of Joseph was an independent intervening act of a third party which operated on, but did not flow from, JCCA's original negligence. Following the instructions of the Court of Appeals in Derdiarian, therefore, this Court may review the record evidence and determine, as a matter of law, whether, given S.'s independent intervening act of attacking Joseph, JCCA's negligence was a proximate cause of Joseph's injury. In doing so, we must evaluate the conduct of S. along the following dimensions, as directed by the Court of Appeals:
"An intervening act may break the causal nexus when it is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct'" (Maheshwari v City of New York, 2 NY3d 288, 295 [2004], quoting Derdiarian, 51 NY2d at 315).
Put otherwise, if the intervening act in question meets any one of the three Maheshwari-Derdiarian criteria, the intervening act is a superseding act sufficient to break the causal connection between the defendant's negligent acts and the harm to the plaintiff, rendering the [*7]defendant's negligence not a proximate cause of the plaintiff's injury (see Derdiarian, 51 NY2d at 315).
In this case, S.'s attack of Joseph meets not only one, but all three of the Maheshwari-Derdiarian criteria. With respect to the first criterion, S.'s attack was clearly extraordinary under the circumstances. Prior to the attack, S. had been a frequent visitor to the Pineda home for a period of nearly six months. Throughout that period, S. did not engage in any acts of violence or display any violent tendencies. Indeed, the JCCA caseworker who visited the Pineda home only three days prior to the attack reported that she found nothing out of the ordinary. Moreover, S. was left alone with Joseph and his own infant son under circumstances where their regular babysitter, Avila, was called away the preceding day on an unexpected family emergency and neither Pineda nor Pilar could remain at home. Under these extraordinary circumstances, S.'s intervening act of attacking Joseph was clearly a superseding act sufficient to break the causal connection between JCCA's negligent acts and Joseph's injuries. For this reason alone, JCCA's negligence is not a proximate cause of the harm to Joseph.
S.'s attack of Joseph also meets the second Maheshwari-Derdiarian criterion, as it was not foreseeable in the normal course of events. Examination of the issue of foreseeability begins with the seminal case of Palsgraf v Long Is. R.R. Co. (248 NY 339 [1928]). As Chief Judge Cardozo there observed, a "[n]egligent . . . act . . . is . . . wrongful and unsocial in relation to other[s], . . . only because the eye of vigilance perceives the risk of damage" (id. at 344). "The risk reasonably to be perceived defines the duty to be obeyed" (id.). In Palsgraf, employees of the defendant railroad company assisted a man carrying a package wrapped in newspaper in boarding a moving train. The man dropped the package, which turned out to contain fireworks. The package exploded, knocking over scales at the other end of the train station platform which fell on the plaintiff, injuring her. The Palsgraf Court held that because the injury to the plaintiff was not foreseeable by the defendant railroad company, the defendant's actions were not a proximate cause of the plaintiff's injury. The Palsgraf Court explained:
"[T]here was nothing in the situation to
suggest to the most cautious mind that
the parcel wrapped in newspaper would spread
wreckage through the station. If the guard
had thrown it down knowingly and willfully,
he would not have threatened the plaintiff's
safety, so far as appearances could warn him.
His conduct would not have involved, even
then, an unreasonable probability of invasion
of her bodily security" (id. at 345).
Palsgraf teaches that the key consideration on a foreseeability inquiry is whether the possibility of harm was apparent to the alleged tortfeasor. For an injury to a plaintiff to be foreseeable, however, the alleged tortfeasor need not have "anticipate[d] the precise manner" in which the harm was caused to the plaintiff, but only the "general risk and character of [the] injuries" (see Derdiarian, 51 NY2d at 316-317).
In cases where the alleged tortfeasor is a social services agency and where the victim of an assault is a person under that agency's charge, this Court has made clear that if the assailant is a visitor to a setting supervised by that agency and has no known history of violence, the assault is not reasonably foreseeable by the agency. For example, in Piazza v Regeis Care Ctr. L.L.C. (47 AD3d 551 [1st Dept 2008]), the plaintiff was assaulted by her brother while they were visiting their mother in the defendant's nursing home facility. In Piazza, the plaintiff's brother had previously visited the nursing home without violent incident and without giving the [*8]defendant agency any other indication of violent tendencies prior to assaulting her. We found that the assault was not foreseeable by the defendant, reasoning that because "there was no evidence that [plaintiff's brother] had a history of physical violence toward plaintiff or their mother prior to the subject incident[,] . . . defendant had no reason to anticipate the assault or duty to take steps to prevent contact between plaintiff and her brother" (id. at 553). Here, as was the case in Piazza, S., in the period of nearly six months from the day of Joseph's foster home placement to the day before his attack of Joseph, was known to JCCA to visit the foster home frequently and yet neither committed any acts of violence in the foster home nor gave any other indication to JCCA that he had violent tendencies.
Similarly, in the context of child placement cases, in order for an act causing injury to be foreseeable by a placement agency, the placement agency must have " sufficiently specific knowledge or notice of the dangerous conduct which caused injury'" (Lillian C. v Administration for Children's Servs., 48 AD3d 316, 317 [1st Dept 2008], quoting Mirand v City of New York, 84 NY2d 44, 49 [1994]). Where the agency has no such knowledge or notice of such conduct, there is no foreseeability. In Lillian C., a foster child was sexually abused by her foster father. The child's mother and legal guardian sued on her behalf, and the defendant placement agency moved for summary judgment of dismissal. This Court looked to the information the placement agency had during its placement and monitoring of the home and found that although background information had been gathered about the foster parents, that information yielded no criminal records, and the foster father specifically denied having any prior arrests or convictions (id.). We therefore found that the plaintiffs had failed to raise a triable issue of fact as to whether the placement agency had specific knowledge or notice of information suggesting any risk of sexual assault, i.e., whether an assault was foreseeable.
Likewise, in Simpson v County of Dutchess (35 AD3d 712 [2d Dept 2006]), a foster child was purportedly assaulted by the foster mother's adult daughter, who also lived in the foster home. The daughter had no criminal history and no history of violence or child abuse or neglect. The Simpson Court held that the foster care agency was entitled to summary judgment because "the assault upon the infant plaintiff purportedly committed by [the foster parent's daughter] was not foreseeable" (id. at 713).
In Belinda L.G. v Fresh Air Fund (183 AD2d 430 [1st Dept 1992]), a case with striking factual similarities to this case, a child placed with a host family by the defendant child placement organization was assaulted by one of the host parents. A question was raised as to whether the defendant agency had negligently failed to personally and more thoroughly reinterview the host family, among other errors. We unanimously affirmed the order of the motion court granting the defendant's summary judgment motion, reasoning that even assuming that the defendant was negligent in failing to conduct personal and more thorough reinterviews of the host family and in other respects, the criminal assault of the child by the host parent "was not a foreseeable consequence of such failure" (id. at 430), given that the agency had successfully placed children with that same family for years, the child had spent two previous summers with the host family without any incident of abuse, and the host parent assailant had previously had an "unblemished record" (id. at 431). We therefore held that the assault there was "an intervening, unforeseeable act and the sole proximate cause of [the] plaintiff's injury" (id. at 431). Similarly, in this case, JCCA had successfully placed foster children in the Pineda home twice before, Joseph had spent several months in that home without violent incident and S. had had no previous record of violence or abuse.
Here, the case for JCCA is even stronger than for the defendant placement agencies in Lillian C., Simpson and Belinda L.G. The record shows that although JCCA conducted no background check on S. because he was not a resident in the foster home and the agency was therefore not under any obligation to do so, even had JCCA conducted such an inquiry, it would [*9]have revealed that S. had no criminal history or history of violence or abuse. Thus, in this case, as in Piazza, Lillian C., Simpson and Belinda L.G., the injury to the infant plaintiff was unforeseeable by the agency.
By contrast, in Garcia v City of New York (222 AD2d 192 [1st
Dept 1996] lv denied 89 NY2d 808 [1997]), cited by the majority and plaintiffs, where a five-year-old student, who was permitted by a kindergarten teacher to go to the bathroom alone in violation of school rules, was sexually assaulted in the bathroom by a attacker later identified as another student in that school, we found that the jury "could reasonably have come to the conclusion that the danger of the assault which occurred was foreseeable and preventable by proper supervision" (id. at 197). Garcia, however, involved two students, left unsupervised, both of whom the school had a responsibility to supervise and the ability to monitor on a continuous basis. Under these circumstances, an assault of one student by another was eminently foreseeable.
Similarly, in Dawn VV. v State of New York (47 AD3d 1048 [3d Dept 2008]), also cited by plaintiffs, a resident of a facility for the developmentally disabled was sexually assaulted by another resident of that same facility after she was left in a room with him unattended. Under these circumstances, involving two residents the facility had responsibility to monitor on a continuous basis, the Dawn VV. Court held that "it was foreseeable that a resident could engage in some type of physical assault against another resident if the enacted safety plans were not adhered to" (id. at 1051). By contrast, here, as in Piazza, the assailant was not a resident of a facility that the agency had the responsibility and capability to monitor continuously, but a visitor to a foster home. Thus, it is not Garcia and Dawn VV., but Piazza and Lillian C., that are the guiding precedent for us, based on the divergent duties the respective agencies had to protect their charges against harm which was foreseeable under the circumstances.
It was also unforeseeable that Avila, who had been Joseph's babysitter for more than two months prior to the incident, would be called out of the country one day prior to S.'s attack of Joseph due to a family emergency. There was nothing to indicate to the JCCA caseworker who had visited Pineda's home the preceding Friday that Avila would not be present the following Monday. Indeed, Avila herself was unaware until two days after the visit that she would not be present. Additionally, JCCA caseworkers were aware of S.'s frequent visits to the foster home and had repeatedly observed his solicitous behavior toward his own son during the nearly six-month period of Joseph's placement, and therefore had no reason to fear his presence. Moreover, S. had displayed no violent tendencies during that period and had no prior history of criminal violence. A JCCA caseworker who had visited the home three days prior to the incident observed that Avila, not S., was the babysitter, and therefore had no reason to suspect that S. would be called in to babysit for Joseph and Angel in Avila's stead. Thus, under the particular circumstances presented in this case, "there was nothing in the situation to suggest to the most cautious mind" that S. would attack Joseph (Palsgraf, 248 NY at 345). Given the uncontroverted facts of this case and the inferences that may be drawn from them, JCCA could not have reasonably foreseen that S. would attack Joseph (see Maheshwari, 2 NY3d at 295), or that even the "general risk and character of [the] injuries" inflicted on Joseph was foreseeable (see Derdiarian, 51 NY2d at 317)[FN10]. Put simply, as there was no foreseeability, there could be no [*10]finding of proximate cause (see Nallan v Helmsley-Spear, Inc., 50 NY2d 507, 518 [1980] ["it [is] logically impossible for [a] jury to find that foreseeability [is] lacking . . . while, at the same time, finding that defendants' negligence was the proximate cause of plaintiff's injury, because . . . foreseeability is an essential element of negligence"]). Therefore, S.'s attack of Joseph was not foreseeable by JCCA in the normal course of events. Satisfaction of this second Maheshwari-Derdiarian criterion, even taken alone, is a sufficient basis for our conclusion that JCCA's negligence was not a proximate cause of Joseph's injury.
The positions advanced by plaintiffs and the majority as to foreseeability miss the mark. While the majority correctly observes that evidence of the foreseeability by JCCA of the precise manner in which an incident occurred is not required in order to establish a causal nexus between JCCA's negligence and Joseph's injury, this does not mean that the attack on Joseph "should lead to liability even though the injury-producing [incident] itself occurred in an unexpected manner" (Di Ponzio v Riordan, 89 NY2d 578, 584 [1997]). Here, as noted above, even the general risk of violence or neglect by S., let alone the specific manner in which he would attack Joseph, was unforeseeable.
S.'s physical attack of Joseph also meets the third Maheshwari-Derdiarian criterion, as it was so independent of and far removed from JCCA's original acts of negligence as to constitute a superseding act sufficient to break the causal nexus between any negligence on JCCA's part and the injury to Joseph (see Derdiarian, 51 NY2d at 315). Specifically, the attack of Joseph was committed unilaterally by an underage visitor with whom JCCA had no relationship and over whom JCCA had no supervisory oversight or control. Moreover, there is no evidence demonstrating that the tragic injury to Joseph was brought about by anything other than S.'s unanticipated attack on him, or that negligence on JCCA's part contributed to Joseph's injury. Thus, the third Maheshwari-Derdiarian criterion is satisfied. This reason, taken alone, is a sufficient basis for my conclusion that JCCA's negligence is not a proximate cause of Joseph's injury.
The majority argues that the fact that Avila, a 53-year-old woman who had babysat for Joseph for more than two months without incident, had not been approved as a babysitter by the agency, was an example of JCCA's ongoing negligence. As already explained, any negligence on JCCA's part in failing to address the issue of Avila's unapproved status, however, has no bearing on whether S.'s wholly unexpected attack of Joseph was a superseding act that served to break the causal nexus between JCCA's negligence and the injury to Joseph.
In sum, having considered the record evidence in light of each of the Maheshwari-Derdiarian criteria, I would find that S.'s attack of Joseph was extraordinary under the circumstances, not reasonably foreseeable in the normal course of events and so independent of and far removed from JCCA's original acts of negligence as to constitute a superseding act. Satisfaction of any one of these criteria is sufficient to break the causal nexus between any negligence on JCCA's part and the injury to Joseph (see Maheshwari, 2 NY3d at 295; Derdiarian, 51 NY2d at 315). In this case, where all three criteria are satisfied, the causal connection is clearly severed. Therefore, JCCA's negligent acts, independently or cumulatively, were not a proximate cause of Joseph's injury (see Nallan, 50 NY2d at 518).
Accordingly, I would modify the order of Supreme Court to the extent of granting JCCA's motion for summary judgment and dismissal of the complaint as against it, and otherwise affirm.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: DECEMBER 21, 2017
CLERK



Footnotes

Footnote 1: At another point, the JCCA records indicate that Ms. Pineda was home but looking for work. The February 3, 2003 progress notes record Ms. Pineda's new "work number," so the agency certainly had notice by then that she was working outside the home.

Footnote 2: There is no support in the record for the dissent's conclusion that JCCA was "aware of Avila's role because she had accompanied Pineda on visits to JCCA offices . . . ." If true, however, JCCA had notice that Pineda was using an unapproved caretaker even earlier than February 21, 2003, but still failed to take any action to correct that.

Footnote 3: Contrary to the dissent's characterization, Mr. S. was not merely "visiting" the infant plaintiff's foster home; he was there daily and, on that day, he was babysitting in violation of the agency's rules and applicable regulations. Contrary to the dissent's suggestion that Avila was the only unapproved babysitter caring for the infant plaintiff, the record suggests that S. had done so with some frequency on occasions prior to February 25, 2003.

Footnote 4:Although the dissent repeatedly characterizes the contents of S.'s "confess[ion]," the record contains no actual evidence of either his allocution or his plea.

Footnote 5:Although the dissent describes S.'s behavior as "solicitous," there is no evidence in the record to support this.

Footnote 6: The dissent concedes that the agency was negligent, but fails to acknowledge the degree to which it violated applicable regulations and its own rules, policies and recommendations. Accordingly, the cases cited by the dissent in which a person in an agency-supervised setting was injured and the agency escaped liability are distinguishable, since in none of those cases was there an allegation that the agency had failed to follow regulations or its own policies or that it failed to act after it had knowledge of a regulation or policy violation (Lillian C., 48 AD3d at 316; Piazza v Regeis Care Ctr., L.L.C., 47 AD3d 551 [1st Dept 2008]; Belinda L.G. v Fresh Air Fund, 183 AD2d 430 [1st Dept 1992]; Simpson v County of Dutchess, 35 AD3d 712 [2d Dept 2006]). Indeed, Lilian C., cited by the dissent, cites to Mirand (84 NY2d at 44), in which the Court of Appeals sustained a jury verdict against a school district for negligent supervision where the student plaintiff was assaulted by another student and her nonstudent brother, resulting in injury. The Court of Appeals held that "[t]he test to be applied is whether under all the circumstances the chain of events that followed the negligent act or omission was a normal or foreseeable consequence of the situation created by the school's negligence" (Mirand, 84 NY2d at 50), and that "[p]roper supervision depends largely on the circumstances surrounding the event" (id. at 51). The Court found that there was sufficient evidence to permit the jury to determine that the school was liable for negligent supervision where, inter alia, the school failed to have security personnel present in violation of its own security plan (id. at 48), and the plaintiff had notified school staff prior to the assault of the absence of security personnel (id. at 50). Belinda L.G. is further distinguishable because the decision in that case does not indicate that the defendant had any special duty to the plaintiff; in contrast, the JCCA has a specific duty under its contract with the City to promote the "optimal health, well-being, and development" of children placed with it, and to protect those children from abuse and neglect.

Footnote 7: Thus, the dissent's claim that JCCA had no "control" over S. overlooks that JCCA had control over Ms. Pineda, and it failed to exercise that control to ensure that she only leave the infant plaintiff with approved adult caregivers. Joseph S. was plainly not in that category.

Footnote 8: Indeed, even the particular harm suffered by the infant plaintiff in this case is, sadly, not uncommon (see Shaken Baby Syndrome Prevention, Children Ages Birth to Four Years, https://www.health.ny.gov/prevention/injury_prevention/children/ fact_sheets/birth-4_years/shaken_baby_syndrome_prevention_birth-4_years.htm, accessed Aug. 24, 2017 [likely more than 3,000 children per year are shaken in the U.S.]).

Footnote 9: An even more unusual set of facts led to a determination that there was an issue of fact as to the defendant's liability in Cook v Wanees (2017 WL 4355378 [Sup Ct, Queens County 2017]).

Footnote 10: There is no basis in the record for the conclusion reached by the majority that the unfortunately common-place nature of "shaken baby syndrome" cases and the efforts by the New York Department of Health to provide information to the public as to prevention of such incidents somehow made S.'s attack of Joseph foreseeable to JCCA.